WINDHORST, J.
Defendant, Ernest R. Blackwell, seeks review of his convictions and sentences for misapplication of payment by a contractor and engaging in business without a contractor's license. For the following reasons, we affirm defendant's convictions and sentences and remand with instructions.
Statement of the Case
On November 4, 2013, the District Attorney for St. John the Baptist Parish filed a bill of information charging defendant, Ernest R. Blackwell, with misapplication of payment by a contractor in an amount greater than one thousand dollars, in violation of La. R.S. 14:202 (count one), and engaging in business without a contractor's license, in violation of La. R.S. 37:2160 (count two).[1] Defendant was arraigned on November 20, 2013, and pled not guilty to the charged offenses. On September 15, 2015, trial commenced before a six-person jury and concluded on September 17, 2015, with a unanimous verdict of guilty on both counts.
On September 30, 2015, the State filed a multiple offender bill of information pursuant to La. R.S. 15:529.1, alleging defendant to be a second-felony offender.
On January 25, 2016, the trial court sentenced defendant on count one, misapplication of payment by a contractor, to fourteen months "incarcerated," with seven of the fourteen months suspended, and on count two, engaging in business without a contractor's license, to fifty-six months in the Department of Corrections, with thirty months suspended during which time defendant is to be placed on active probation. The trial court ordered that these sentences were to be served concurrently. Immediately *486 after sentencing, defense counsel moved for the granting of his written motion for appeal filed on October 20, 2015, which the trial court orally granted.
On February 16, 2016, after a hearing on the multiple offender bill, the trial court found the State had met their burden of proof as to the predicate convictions alleged in the multiple bill. On May 4, 2016, a restitution hearing was conducted. On September 9, 2016, the trial court ordered defendant to pay restitution on count one in the amount of $5,510.11 to the victims in this case. The court then resentenced defendant as a second-felony offender, to five years imprisonment with the Department of Corrections on count one and six years imprisonment with the Department of Corrections on count two. The trial court further ordered defendant's enhanced sentences to run concurrently with each other and imposed a two thousand dollar ($2,000) fine on each count.
On June 19, 2017, defendant filed an application for post-conviction relief (APCR) seeking an out-of-time appeal. On August 14, 2017, finding an appeal had previously been filed on defendant's behalf, the trial court signed defendant's written motion for appeal, which was filed on October 20, 2015, and orally granted after sentencing in January of 2016.
Facts
Defendant's convictions stem from repair work done for Thomas and Michelle Calmes. Mr. and Mrs. Calmes' home in LaPlace, Louisiana, was badly damaged in 2012 by Hurricane Isaac. In mid-September of 2012, Mr. and Mrs. Calmes hired defendant to perform repair work on their home because of his competitive quote, projected timeline, and "because he portrayed himself as a contractor who would do all the subcontracting" and supervise the work. According to Mrs. Calmes, defendant indicated that he was a licensed contractor able to perform all of her home repairs and that anything he was unable to do he would hire subcontractors to do. At trial, Mrs. Calmes testified that when meeting defendant, he provided her with a flyer indicating that he was with Professional Remodeling Specialists, aka "PRS, LLC" (PRS), which contained a license number (40025) indicating an association with "Dean Walters, Residential/Commercial State Licensed Contractor," as well as two email addresses, namely "eblackwell777@yahoo.com" and "professionalrspecialists@gmail.com." Mrs. Calmes explained that she would have never hired someone who was not a licensed contractor.
Defendant personally presented Mr. and Mrs. Calmes with two contracts for repair work, which they both signed on October 11 and 13, 2012. The first contract pertained to all labor and materials for repairs to their home with a contract price of $82,500.00, and the second was for roof repairs with a contract price of $12,000.00. Mrs. Calmes testified that the company listed on the contract was "Dean Walters, d/b/a Professional Remodeling Specialists, LLC," license number 40025, and was signed on behalf of PRS by Keely Authement.[2] Defendant told the Calmeses that Ms. Authement was a company officer, that she signed all contracts, and that he and Dean Walters were co-owners of PRS. Mr. and Mrs. Calmes never met either Ms. Authement or Mr. Walters.
Work began on the Calmeses' home on October 15, 2012. At trial, Mrs. Calmes explained that the repairs to her home would be financed by insurance money *487 paid directly to her mortgage company, Wells Fargo, who would then release payment to her and her husband. Defendant, as the contractor/owner of PRS, signed a waiver of lien, required by Wells Fargo, related to his work on the project.
Mrs. Calmes testified that she and her husband paid defendant approximately $55,000.00. The first check, dated October 18, 2012, was from Mrs. Calmes' personal bank account for $8,000.00, written out to PRS, and was endorsed for deposit by Ms. Authement. The second check, dated October 25, 2012, was issued by Wells Fargo, made out to PRS and the Calmeses, and was for $6,032.78. Mrs. Calmes testified that she and her husband, along with defendant and Ms. Authement, endorsed the check. A third check, dated November 8, 2012, was issued by Wells Fargo and was made out to PRS and the Calmeses, for $16,661.19. The Calmeses and only defendant endorsed this check. The last check dated December 7, 2012, was from Wells Fargo, for $24,964.47, and was made out to PRS and the Calmeses. The Calmeses endorsed this check and gave it to defendant.
Mrs. Calmes recalled that once work commenced, there were problems with the sheetrock, paint, the wood flooring, and the kitchen and bathroom tile. She explained that defendant was difficult to contact and that defendant's subcontractors complained that defendant was not paying them for their work. Mrs. Calmes testified that while the contract stated that the price included labor and materials, the Calmeses spent approximately $8,000.00 of their own money purchasing materials at defendant's request. Defendant told the Calmeses that he would reimburse them for their purchases but never did.
Mrs. Calmes further testified that she and her husband selected cabinets and countertops from John Sun Kitchen and Bath (John Sun) as part of the repairs to be made to their home and that defendant only paid a portion of the money owed to John Sun, claiming that the cabinets had not been installed correctly. According to Mrs. Calmes, defendant was aware that money was owed for the cabinets and informed the Calmeses that it would be paid off. However, because the bill was not paid, a lien was placed on the Calmeses' home for the outstanding amount.
The Calmeses terminated defendant's services on January 14, 2013, and filed a complaint against him with the state licensing board. They also took out an SBA loan in the amount of $39,000.00 to cover the expenses they incurred by having to hire a new contractor.
Thomas Calmes corroborated his wife's testimony, in pertinent part, confirming that defendant submitted an estimate for their home repairs from his personal email account to his wife's email, that he signed the contract given to him personally by defendant, that defendant represented to him that he was a licensed contractor, that defendant committed to doing their home repairs, and that defendant began work on their home on October 15, 2012. Mr. Calmes also testified that he contacted the licensing board before signing the contract with defendant and confirmed that the license number in the contract (40025) was a valid license. From the outset, Mr. Calmes recalled the progression of work to be slow and the workmanship to be poor. He further noted that when he and his wife terminated defendant's employment, they had paid him approximately $55,000.00 and that their home was still not complete and was unlivable. Thus, Mr. Calmes testified that they hired a second contractor to finish the repairs.
Todd Duhe, business owner of InspecTile, was qualified as a forensic expert on tile, stone, and flooring. He testified that in *488 January of 2013, Mr. Calmes contacted him about incomplete work performed on his home. Upon inspection of the Calmeses' home, Mr. Duhe reported that the Calmeses were living in one bedroom of the house and were using the hallway bathroom. He noted several areas of concern regarding the workmanship performed on the house in the master bathroom, the hallway bathroom, the kitchen, and the wood flooring, all requiring removal and replacement of the materials used. Mr. Duhe concluded his report finding, "This entire installation reflects improper installation methods. Contractor did not follow minimum guidelines or procedures. Remove and replace all mentioned areas."
At trial, Carl Bourque, residential compliance supervisor for the State Contractor's Board, testified that a home improvement license is required to perform residential work between $7,500.00 and $75,000.00. Mr. Bourque explained that a contractor is considered anyone who hires subcontractors, submits bids, supervises, or oversees a job. Based on licensing records, Mr. Bourque testified that defendant possessed a state license to perform residential contracting work some time in 2010 or 2011, but that his license was revoked on August 22, 2012, and then reinstated on October 22, 2012, with a retroactive date of October 18, 2012. Thus, there was a period of two months between August 2012 and October 2012 where defendant could not legally act as a residential contractor on jobs in excess of $7,500.00 under the law.
Mr. Bourque further testified that as residential compliance supervisor, he received a written complaint from the victims, Mr. and Mrs. Calmes, regarding defendant's work on their home. The Calmeses provided Mr. Bourque with a copy of their contracts with defendant dated October 11, 2012, and October 13, 2012, dates on which defendant did not possess a valid contractor's license. Mr. Bourque explained that: (1) a licensed contractor is not permitted to let another person use their license; (2) anyone who submits bids or presents a contract for residential work is required to have a valid license; (3) the person submitting a bid for home improvement work must submit it in his own licensed name; and (4) payment must be made to the licensed person submitting the bid.
During Mr. Bourque's investigation of the Calmeses' complaint, Mr. Bourque contacted Dean Walters who, through written correspondence, maintained that he had never met the Calmeses before, that he had no knowledge of the project, and that he did not give defendant permission to use his license. Mr. Bourque also testified that defendant's license was revoked a second time; that prior to 2012 there had been several complaints from other homeowners regarding his work; and that the Board had previously found him guilty of practicing without a license.
The St. John Parish Sheriff's Office detective, who investigated the Calmeses' complaint, testified that he obtained from them the flyer defendant gave them advertising his services and the $82,500.00 renovation contract they entered into with defendant. During its investigation, the Sheriff's Office found the following information. Neither defendant nor PRS had a valid license at the time the contract was entered into with the Calmeses. The Calmeses' last check to defendant for approximately $25,000.00 on December 12, 2012 was deposited into an account belonging to a different corporation, Professional Shoring Elevations. After depositing the Calmeses' $25,000.00 check, defendant transferred $8,000.00 into his personal savings account. On December 13, 2012, defendant paid John Sun *489 $6,000.00 for the Calmeses' cabinets via check. After this payment to John Sun, there was approximately a $2,824.00 balance owed to John Sun, which defendant did not pay despite having received adequate funds from the Calmeses to cover the remaining balance. Because defendant failed to pay this balance, a lien was placed on the Calmeses' property by John Sun. There were also a series of checks totaling $7,000.00 written out to Ms. Authement from the Calmeses' check that had been deposited into defendant's personal Chase account and several checks written out from the Chase account to defendant's relatives and to Mr. Walters. Defendant also used the money received from the Calmeses to make payments on other construction projects totaling $4,000.00.
During its investigation, the Sheriff's Office discovered from the Louisiana Secretary of State's website that PRS was incorporated on September 10, 2012 by Ms. Authement, who was listed as the registered agent and principal member. In December 2012, Mr. Walters was added as a "second party."
After defendant was arrested and advised of his Miranda [3] rights, he admitted that he performed work on the Calmeses' house and confirmed that he had been paid approximately $54,000.00 - $55,000.00 for that work. Defendant stated that he was unaware of any problems regarding his work until the Calmeses terminated him. Defendant said he used Mr. Walter's license number because he had taken "on another party to alleviate some of" his workload and confirmed that Ms. Authement was his ex-girlfriend. Defendant explained that he had not paid the outstanding balance owed to John Sun for the Calmeses' cabinets because he had not been paid enough money. Defendant admitted that the email "eblackwell777@yahoo.com" contained on the flyer provided to the Calmeses was his personal email address and that one of the phone numbers listed on the flyer was for Professional Shoring Elevations, a corporation defendant started in 2011 with Mr. Walters.
The bank records for PRS showed that this company maintained two accounts, one with Regions bank and one with Capital One bank. The account maintained at Regions was listed under the name "PRS, 225 Lee Street, Slidell," with an associated email address of "professionalrspecialists@gmail," which was consistent with the flyer provided by defendant. The signatory listed on the account was Ms. Authement. But, the Regions bank records contained several cancelled checks signed by defendant, including a check signed by defendant for work performed on the Calmeses' house. Prior to the deposit of the Calmeses' checks, the Regions account contained less than $100.00. After the deposits were made, the records showed that Ms. Authement authored checks to herself for $3,000.00 in October of 2012 and $1,000.00 in November of 2012. The PRS business account further reflected spending charges at clothing retail stores and bar establishments.
As to the Capital One account, bank records reflected defendant was signing checks made out to PRS and was writing checks to Mr. Walters and Ms. Authement. Defendant also had a personal bank account with Capital One in which two checks made out to PRS d/b/a Ernest Blackwell were deposited.
At trial, the John Sun office manager confirmed that in September of 2012, her business provided cabinets for the Calmeses' renovation. The invoice dated *490 December 14, 2012 for $8,824.00 was billed to Professional Shoring via email address "eblackwell777@yahoo.com." John Sun received a check for $6,000.00 from Professional Shoring Elevations and signed by defendant, leaving a remaining balance of $2,824.00. Repeated attempts were made to secure payment of the outstanding balance to no avail, so a lien was placed on the Calmeses' property on March 15, 2013. The outstanding invoice was eventually paid a few months prior to trial on May 13, 2015, by cashier check listing the name of the remitter as "Mr. Walters." The outstanding fees owed for the filing of the lien in the amount of $475.00 were also paid by cashier check the day before the trial commenced, referencing Mr. Walters as the remitter and hand delivered by a woman who identified herself as "Keely."
Cynthia Butler testified that she hired defendant in May of 2011 to elevate her home after receiving a written quote from "PRS" identified as contractor's license number 880811, and signed by defendant. Ms. Butler signed a written contract with PRS, with license number 880811 and signed by Jason Collin, a proxy for defendant. Ms. Butler testified that defendant performed work on her home, which eventually led to charges filed against him in Jefferson Parish for theft and home improvement fraud.
Brian Blackwell, defendant's brother, testified on behalf of the defense. He stated that he performed work for PRS on the Calmeses' house seven days a week and that defendant acted as supervisor. He asserted that Mr. Walters and Ms. Authement, and on occasion, defendant, paid him for his work.
Lastly, Keely Authement, defendant's ex-girlfriend, testified that she has been in the construction business for many years, and that in September of 2012, she formed PRS with Mr. Walters, whom she met through defendant. She further explained that she and Mr. Walters are the only two owners of PRS and that Mr. Walters is a licensed contractor. Ms. Authement stated that she hired defendant as her foreman to perform work on houses that had been damaged in St. John Parish in 2012 as a result of Hurricane Isaac. Ms. Authement testified that as co-owner of PRS, she signed a contract with the Calmeses containing PRS' license which she authorized defendant to deliver to the Calmeses. Ms. Authement stated that she never received a check for $6,000 for roof work allegedly performed on the Calmeses' roof. She further testified that she authorized defendant to pick up the Calmeses' cabinets from John Sun and that defendant paid for the cabinets out of his own account and was then reimbursed by PRS. Ms. Authement was unaware that a lien was pending on the Calmeses' home because of outstanding fees owed to John Sun for the cabinets; however, when she became aware, the money owed was paid.
Defendant appeals his convictions and sentences, asserting that there was insufficient evidence at trial to convict him of engaging in the business of contracting without a license and misapplication of payment by a contractor; and that the trial court erred in not granting his motion for mistrial after certain statements made by a St. John Parish Sheriff's Office detective during his testimony. For the following reasons, we affirm defendant's convictions and sentences.
Assignment of Error One
In his first assignment of error, defendant challenges the sufficiency of the evidence used to convict him of engaging in the business of contracting without a license and misapplication of payment by a contractor. Based on the following, we find this assignment of error lacks merit.
*491 The United States Supreme Court has established the standard of review for determining the sufficiency of the evidence as whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to evaluate whether the evidence at trial established guilt beyond a reasonable doubt. State v. Flores, 10-651 (La. App. 5 Cir. 5/24/11), 66 So.3d 1118, 1122. The reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson, 443 U.S. at 319, 99 S.Ct. 2781 ; see also State v. Ortiz, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998) ; State v. Holmes, 98-490 (La. App. 5 Cir. 3/10/99), 735 So.2d 687, 690. It is not the function of the appellate court to assess credibility or re-weigh the evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442, 443.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Wooten, 99-181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La. 1/14/00), 753 So.2d 208.
Engaging in Business without a Contractor's License
As to the conviction of engaging in the business of contracting without a license, defendant maintains the State failed to establish that he acted in any capacity with the Calmeses other than as a mandatary/agent for PRS, a licensed company legally able to engage in the business of contracting. He asserts that the contract signed by the Calmeses on October 5, 2012 contained a valid contractor's license number for PRS and that he neither advertised himself as a contractor nor personally signed the contract with the Calmeses. The State responds that the jury reasonably concluded from the evidence adduced at trial that PRS was defendant's alter ego and that he acted as the contractor for the renovations performed on the Calmeses' home. The State maintains that defendant represented himself to the Calmeses as a licensed contractor and owner of PRS, despite the lack of a valid contractor's license.
Defendant was convicted of engaging in business without a contractor's license, in violation of La. R.S. 37:2160(A)(1), which prohibits any person from engaging in the business of contracting or acting as a contractor without an active license as a contractor. As it pertains to this case, La. R.S. 37:2150.1(8) defines a "home improvement contractor" as "any person, including a contractor or subcontractor, who undertakes or attempts to, or submits a price or bid on any home improvement contracting project." Home improvement contracting means the:
[R]econstruction, alteration, renovation, repair, modernization, conversion, improvement, removal, or demolition, or the construction of an addition to any *492 pre-existing owner occupied building which building is used or designed to be used as a residence or dwelling unit, or to structures which are adjacent to such residence or building.
La. R.S. 37:2150.1(7). When the cost of the undertaking exceeds seventy-five thousand dollars, any person performing home improvement contracting as provided for in La. R.S. 37:2150.1(7), supra, is considered a "residential building contractor." La. R.S. 37:2150.1(11).
In this case, in mid-September of 2012, the Calmeses hired defendant to repair damage to their home caused by Hurricane Isaac. According to the Calmeses, defendant represented himself as a licensed contractor who would supervise all of their home repairs. The advertisement flyer defendant gave the Calmeses contained defendant's contact information for the company, PRS, which they believed defendant to own. The Calmeses testified that defendant personally performed the walk-through of their home and provided them with an estimate via his personal email address.
Once the home renovation cost of $82,500.00 was agreed upon, defendant personally delivered the contract to the Calmeses who signed the contract on October 11, 2012. The contract entitled "Dean Walters d/b/a Professional Remodeling Specialists, LLC," with a Louisiana State License number of 40025, was signed by Keely Authement, "Rep. for Professional Remodeling Specialists, LLC," whom the Calmeses had never met. After questioning defendant regarding the identity of Ms. Authement, defendant's ex-girlfriend, defendant informed the couple that she was an officer of PRS and "signed all contracts." Defendant also informed the Calmeses that he and Dean Walters-whom they had also never met-were co-owners of PRS. On the same date, a conditional waiver of lien was executed by the Calmeses and defendant as "owner" of PRS and was provided to the Calmeses' home mortgage company. Work began on the property on October 15, 2012, and was terminated on January 14, 2013, after defendant's promise of job completion had not been met, and the work that was performed proved to be substandard.
The evidence at trial established that per Louisiana State Licensing records, defendant did not possess a valid contractor's license at the time of the execution of the contract with the Calmeses. Specifically, Mr. Bourque, compliance supervisor for the State of Louisiana Contractor's Board, testified that at the time defendant entered into the contract with the Calmeses, his residential contracting license had been revoked, and he was prohibited from acting as a residential contractor on jobs in excess of $7,500.00. Mr. Bourque further testified that while Dean Walters possessed a valid contractor's license during the relevant time period, neither PRS nor Ms. Authement, who signed the contract on behalf of PRS, did. Mr. Bourque explained that a licensed contractor may not permit another person to use their license and that anyone who submits bids or presents a contract for residential work is required to have a valid license.
Additionally, during the investigation of this case, the Sheriff's Office discovered that the Louisiana Secretary of State's website reflected that PRS was incorporated on September 10, 2012, and was formed by Ms. Authement who was listed as the registered agent and principal member. It was not until December of 2012, months after the signing of the contract at issue, that Mr. Walters was added as a "second party." According to Ms. Authement, defendant thought it would be "a good idea" to use the name PRS for the LLC she created because he had performed business *493 in the past under the name PRS. The investigation also revealed that defendant received and signed checks for the work from the Calmeses, although defendant was not listed as a signatory on PRS' bank account, and that defendant deposited two checks made out to PRS d/b/a Ernest Blackwell into his personal account with Capital One.
Based on the evidence and testimony adduced at trial, neither defendant nor PRS as an entity could validly enter into a contract with the Calmeses on October 11, 2012. "If a member of a limited liability company personally acts in the capacity as a contractor without an active contractor's license accorded to himself or to the limited liability company, that member's actions constitute criminal conduct." State v. Allen, 14-0291 (La. App. 1 Cir. 6/4/15), 174 So.3d 1163, 1170, writ denied, 15-1337 (La. 9/6/16), 205 So.3d 914. Here, the license number used by defendant during and after his contract negotiations with the Calmeses belonged to Mr. Walters, who, through written correspondence, denied any knowledge of the Calmes project, had never met the Calmeses before, and had not given defendant permission to use his license, nor could he have under the law.
Considering the foregoing, we find the evidence established that defendant was the contractor for the construction project at the Calmeses' home, who at all pertinent times, did not hold an active contractor's license and was not working as an "agent" on behalf of Mr. Walters d/b/a PRS. The jury chose to reject defendant's theory that he was merely acting in a representative capacity as an employee of Mr. Walters d/b/a PRS. It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will not second-guess those determinations. Smith, 661 So.2d at 443. Accordingly, we find the evidence was sufficient to convince a rational tier of fact, beyond a reasonable doubt, that defendant engaged in the business of contracting without an active contractor's license.
Misapplication of Payment by Contractor
Defendant was also convicted of misapplication of payments by a contractor, in violation of La. R.S. 14:202, which provides, in pertinent part:
No person, contractor, subcontractor, or agent of a contractor or subcontractor, who has received money on account of a contract for the construction, erection, or repair of a building, structure, or other improvement, including contracts and mortgages for interim financing, shall knowingly fail to apply the money received as necessary to settle claims for material and labor due for the construction or under the contract.
To convict a defendant of misapplication of payments by a contractor, the State must prove: (1) the existence of a contract to construct, erect, or repair a building, structure, or other improvement; (2) the receipt of money on the contract; and (3) a knowing failure to apply the money received as necessary to settle claims for material and labor due under the contract. State v. Spears, 05-0964 (La. 4/4/06), 929 So.2d 1219, 1223. Proving misapplication of the funds is not enough. The State must prove that the misapplication was made knowingly. Allen, 174 So.3d at 1167. Specific intent may be inferred from the circumstances and actions of the defendant. Spears, 929 So.2d at 1223-24.
As to the misapplication of payment offense, defendant argues the State failed to establish that he knowingly failed to pay all outstanding invoices relative to the *494 Calmeses' renovation project.[4] The State asserts that the evidence at trial established that despite his awareness of the debt owed to John Sun for cabinets installed in the Calmeses' home, defendant refused to pay the outstanding balance with the funds the Calmeses paid him, but instead deposited the money for the cabinets into his own account and used the Calmeses' funds to pay for other projects.
John Sun's office manager confirmed at trial that an invoice dated December 14, 2012 for $8,824.00 was billed to a company called "Professional Shoring" via defendant's personal email address. She testified that John Sun received a $6,000.00 check from defendant, leaving a balance of $2,824.00 on the account which was reflected on a subsequent invoice returned to defendant. Despite repeated attempts to secure payment of the outstanding debt owed to John Sun, it was forced to place a lien on the Calmeses' property.
Mrs. Calmes testified that she was informed by defendant that he only paid a portion of the money owed for the cabinets because they had been installed incorrectly; however, he indicated the debt would be paid. This was in direct contradiction to the statement defendant provided to Detective Michael Shard during which he stated that the outstanding balance owed to John Sun had not been paid because he had not received enough money from the Calmeses.
Defendant's statement to Detective Shard was also refuted by the documentary evidence introduced at trial which showed the Calmeses gave defendant a check on December 12, 2012, for approximately $25,000.00, which defendant deposited into his Chase bank account (which had a balance of only a few dollars prior to the deposit) associated with defendant's corporation, Professional Shoring Elevations. The evidence also established that on December 13, 2012, defendant wrote a check in the amount of $6,000.00 to John Sun, drawn from his Chase bank account, leaving a balance owed to John Sun of approximately $2,824.00 despite having adequate funds paid by the Calmeses to cover the remaining balance. Detective Shard testified that after defendant deposited the Calmeses' $25,000.00 check into his Chase account, a transfer of $8,000.00 was made into defendant's savings account, and a series of checks totaling $7,000.00 were written out to various people including Ms. Authement and defendant's brother. Detective Shard also testified that defendant used the Calmeses' $25,000.00 check to make payments on other construction projects totaling $4,000.00-an amount sufficient to pay the outstanding balance owed to John Sun.[5]
Based on the foregoing, we find the evidence was sufficient for a reasonable jury to find that defendant acted knowingly when he refused to pay the outstanding *495 balance owed in the amount of $2,824.00 to John Sun despite having adequate funds from the Calmeses to cover the amount owed and that defendant instead utilized the money to pay for other projects and for his own gain. Accordingly, a rational trier of fact could have concluded beyond a reasonable doubt that defendant was guilty of misapplication of a payment by a contractor, in violation of La. R.S. 14:202.
Assignment of Error Two
In his second assignment of error, defendant argues the trial court erred in denying his motion for mistrial premised on witness Detective Shard's statement regarding defendant's pending charge for home improvement fraud (the misdemeanor charge being tried by bench trial simultaneously with the instant offenses). He asserts that the mention of the pending misdemeanor charge tainted the jury's impression of him and that the trial court's admonition for the jury to ignore the statement was not sufficient to overcome its prejudicial effect.
The State maintains Detective Shard's remark concerning home improvement fraud was not so prejudicial as to deny defendant a fair trial. The State maintains that Detective Shard's comment did not indicate that defendant had been charged with a third offense and that the comment could not have prejudiced defendant given the fact that the jury was already aware defendant had falsely represented himself as a licensed contractor.
At trial, during the cross-examination of Detective Shard, defense counsel questioned the detective regarding his support for the charge of misapplication of a payment by a contractor brought against defendant in this case. As part of defense counsel's questioning regarding the misapplication charge, he also asked Detective Shard whether he had formulated an opinion as to whether the work on the Calmeses' house was properly done, prompting the following response from the detective:
There was the information provided by the state board who comes to inspect things like that. There was an independent report conducted that I was afforded the opportunity to review, which, of course, would be by a person licensed to do such things as that. Just, again, based on the totality of the circumstances, it's based on the actual aesthetics. It's not something that I would enforce. It's the - you know, the situation with John Sun, having no license, speaking to Mr. Bourque, and the home improvement fraud based on false representation of fact at the time of the contract. That was the basis for my charges.
Defense counsel immediately moved for a mistrial based on the alleged reference by Detective Shard to another crime. The trial court denied defendant's motion for a mistrial and admonished the jury that they were to disregard "any reference to the crime entitled 'home improvement fraud' " given by the witness.
La. C.Cr.P. art. 771 is the article applicable to the situation presented in the instant matter. La. C.Cr.P. art. 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court *496 official, regardless of whether the remark or comment is within the scope of Article 770.
A mistrial is a drastic remedy and is warranted only where remarks result in substantial prejudice sufficient to deprive defendant of a fair trial. State v. Ventris, 10-889 (La. App. 5 Cir. 11/15/11), 79 So.3d 1108, 1123, writ denied, 13-1532 (La. 4/17/14), 138 So.3d 616. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. State v. Massey, 10-861 (La. App. 5 Cir. 6/14/11), 71 So.3d 367, 372, writ denied, 11-1621 (La. 4/20/12), 85 So.3d 1259.
We find no error in the trial court's denial of defendant's motion for mistrial. First, the prosecution did not deliberately elicit Detective Shard's comment. Detective Shard made the comment in direct response to defense counsel's questioning on cross-examination. Second, Detective Shard made the remark in response to an open-ended question posed by defense counsel and it was an isolated vague reference to "home improvement fraud," not a direct reference to an additional charge pending against defendant. Third, Detective Shard's remark pertaining to home improvement fraud was made in connection with his belief that defendant had made "false representation of fact at the time of the contract," a fact which was already known to the jury as defendant's misrepresentations formed the basis for the charge of engaging in business without a contractor's license.
Additionally, during cross-examination of Detective Shard, defense counsel asked numerous questions regarding the detective's expertise in the area of contractor fraud. Specifically, Detective Shard testified that at the time of the investigation of this case, he was the primary investigator for his office's contractor fraud division and further confirmed, in response to defense counsel's inquiry and without objection, that this case was his first one "dealing with any of the contracting fraud." Considering the foregoing, we do not find that the detective's passing remark about "home improvement fraud" substantially prejudiced defendant.
Moreover, it appears defendant received an adequate remedy under La. C.Cr.P. art. 771 when defense counsel requested that the jury be admonished and the court complied, instructing the jury to disregard Detective Shard's testimony pertaining to the subject remark. See State v. Lee, 618 So.2d 551 (La. App. 4 Cir. 1993) ; State v. Maiden, 463 So.2d 848 (La. App. 2 Cir. 1985).
Accordingly, because the record does not indicate that defendant suffered substantial prejudice that deprived him of any reasonable expectation of a fair trial, we find that the trial court did not abuse its discretion in denying the motion for mistrial.
Errors Patent
There are several discrepancies to note with respect to the multiple offender minute entry, multiple offender uniform commitment order (MO-UCO), and the transcript. First, the MO-UCO incorrectly reflects the offense date as September 3, 2013, while the record reflects that count one occurred on or between October 5, 2012 and February 21, 2013, and count two occurred on or about October 11, 2012 and October 13, 2012. Second, the MO-UCO incorrectly reflects the adjudication date as September 12, 2016. Defendant, however, was convicted on counts one and two on September 17, 2015, and was adjudicated a second-felony offender on February 16, 2016. Third, while the MO-UCO correctly reflects a *497 sentence date of September 12, 2016 (the date when defendant was resentenced as a multiple offender on both counts), the date of defendant's original sentencing on the underlying charges, January 25, 2016, is not reflected. Fourth, the MO-UCO does not indicate that defendant's sentences on counts one and two were enhanced. Finally, the multiple offender minute entry and the MO-UCO reflect that the trial court imposed $38,900.00 in restitution on count two (engaging in business without a contractor's license), when the transcript reflects that the trial court imposed said restitution on defendant's misdemeanor conviction for home improvement fraud, which is before this Court in a separate appeal.
Given the above inconsistencies, we remand this case to the trial court for correction of the minute entry/UCO to accurately reflect the noted discrepancies. See State v. Lyons, 13-564 (La. App. 5 Cir. 1/31/14), 134 So.3d 36, writ denied, 14-0481 (La. 11/7/14), 152 So.3d 170. We also direct the Clerk of Court for the 40th Judicial District Court to transmit the original of the corrected MO-UCO to the appropriate authorities in accordance with La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department. See State v. Doucet, 17-200 (La. App. 5 Cir. 12/27/17), 237 So.3d 598, writs denied, 18-77 (La. 10/8/18), 253 So.3d 789 and 18-196 (La. 11/5/18), 255 So.3d 1052.
Decree
For the foregoing reasons, we affirm defendant's convictions and sentences. We remand this matter for correction of the minute entry/UCO to accurately reflect the noted discrepancies.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED

On the same date, the State filed a separate misdemeanor bill of information, charging defendant with home improvement fraud. La. R.S. 14:202.1. Following a joint jury/bench trial, on December 28, 2015, the trial court found defendant guilty of this misdemeanor offense. This conviction is on appeal before this Court under case number 18-KA-118.

Testimony revealed that Ms. Authement is defendant's ex-girlfriend and is not a licensed contractor.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Defendant does not dispute the first two elements the State was required to prove, namely the existence of a contract and the receipt of money on the contract. On appeal, defendant contests the third element, the knowing failure to apply the money received by the Calmeses to settle a debt owed to John Sun for cabinets.

The State also established at trial that the Calmeses paid defendant over $55,000.00 in money they received from their insurance company for the repair of their home; that pursuant to the contract, defendant was to supply the labor and materials for the job; however, defendant often asked the Calmeses to pay for certain materials out-of-pocket which he indicated would be reimbursed. Receipts detailing these out-of-pocket expenses were introduced into evidence, and there was testimony that defendant never reimbursed the Calmeses. This evidence and testimony further supports defendant's misapplication of a payment by a contractor conviction.